**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 5:10CR554 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | **DEFENDANT LAUREN MAY'S** |
| LAUREN MAY | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| Defendant. | ) | |

Now comes Defendant, Lauren May, by and through counsel, Elisa Staats, and submits to this Honorable Court this Sentencing Memorandum for its consideration prior to and during the sentencing that is scheduled for April 29, 2013 at 10:30 a.m.

## INTRODUCTION

When Lauren decided that she wanted to be a real estate investor, she attended seminars on how to make money buying and selling real estate. She was driven, she wanted to make money so that she could feel important and empowered and to help others. In Lauren's effort to "succeed," she disregarded being forthright with IndyMac when she had her husband enter into a loan agreement for a condominium at WatersEdge in Florida. When Lauren dreamed of being a real estate mogul, she did not think that her fervor would lead to criminal charges. During the two years since entering her plea, Lauren has come to learn that being a success is less about making money and more about empowering others.

Lauren May respectfully submits this sentencing memorandum in support of her position that the court's independent application of 18 U.S.C. Section 3553(a) reveals that a sentence greater than the sentence recommended and agreed upon the parties is not warranted.

**PLEA AGREEMENT**

On January 31, 2011, pursuant to Federal Criminal Rule of Procedure 11(c)(1)(A) and (B), Lauren May pled guilty to the Information. The plea agreement was entered pursuant to which provides in pertinent part:

> (c) Plea Agreement Procedure.
>
> (1) In General. An attorney for the government and the defendant's attorney…may discuss and reach a plea agreement. The court must not participate in these discussions. If the defendant pleads guilty…the plea agreement may specify that an attorney for the government will:
>
> ***
>
> (A) not bring, or will move to dismiss, other charges;
> (B) recommend, or agree*** that a particular sentence or sentencing range is appropriate or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request does not bind the court);

The parties understanding regarding the plea agreement is that pursuant to U.S.S.G. § 2B1.1 (a)(2), Lauren's base offense level is 6. Since the intended loss was more than $200,000, in accordance with U.S.S.G. §2B1.1 (b)(1)(G), the parties agree to an increase of 12 levels. Because Lauren is a minimal participant, pursuant to U.S.S.G.§ 3B1.2 (a), she is entitled to a 4 level reduction. The subtotal offense level is 14, and the total offense level is 12 with acceptance of responsibility under U.S.S.G. § 3E1.1. With the court's acceptance of a government motion made pursuant to U.S.S.G. Section 5K1.1. for a

downward departure of (4), allows sentencing to take place at level 8 (0 - 6 months). The parties further agree that Lauren's guideline level should be in Zone A of the sentencing guidelines table. However, the plea agreement binds the parties and not the court. By contrast, a plea agreement pursuant to Fed Crim Rule 11(c)(1)(C) binds the court.

In further recognition of the court's authority under this plea agreement reached pursuant to Fed Crim Rule 11(c)(1)(B), the plea agreement itself at paragraph 40 expressly sets forth that Defendant "understands that the recommendations of the parties will not be binding upon the Court, that the Court alone will decide the advisory guideline range under the Sentencing Guidelines, whether there is any basis to depart from that range or impose a sentence outside the advisory guideline range, and what sentence to impose." Lauren May Plea agreement at para 40. Likewise, paragraph 4 of the plea agreement advises Lauren May that she understands that "the Court must impose a sentence [which is] sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2) and that the Court * * * must consider the advisory U.S. Sentencing Guidelines and other sentencing factors set forth in §3553(a) in determining the sentence.

**SECTION 3553(a) SENTENCING FACTORS**

Lauren May has pled guilty, accepts responsibility and has advised the court that she did the things in the Information. 18 U.S.C. Section 3553(a) (1) provides, in part, that the court shall consider the nature and the circumstances of the offense and the history and characteristics of the defendant. Culpability comes with a factual context. Lauren May respectfully asks this court to consider that her culpability comes with a complex set of circumstances, involving her family and her need to feel important. Given this set of

circumstances, it is respectfully submitted that Lauren May's conduct falls well below the conduct typical of the offense.

**Lauren MAY'S DESIRE TO FEEL IMPORTANT BY CONTRIBUTING FINANCIALLY TO HER FAMILY**

Prior to this charge, Lauren had no criminal history. She did not even have a vehicular moving violation. At her core, she is a good, honest, contributing member of society who was temporarily driven by money, not so that she could make a fortune, but so that she could feel significant by making a financial contribution to her family.

Lauren was born in Geneva, New York in 1962 to Calvin and Sabra Hunter. Lauren has one older sister, Karen Stromquist, and a younger brother, Calvin Hunter. At the age of two, her family moved to Battle Creek, Michigan. The family lived in Battle Creek, Michigan until 1977 when they relocated to Dover, Ohio. Lauren graduated from Dover High School in 1980. Lauren remembers feeling responsible for the happiness of others. It resulted in Lauren being a people pleaser.

Although Lauren is very educated, she was not able to find the right career before becoming a stay-at-home mother. Lauren graduated from DePauw University in Greencastle, Indiana with a degree in psychology in 1984. From 1984 until 1986 Lauren worked as Assistant Program Director at SMU International Programs. In 1986, she decided to pursue a teaching career so she enrolled at Ohio State University in Columbus, Ohio and earned a Bachelor's Degree in Education in 1988. Although trained as an elementary school teacher, Lauren did not enjoy her career choice. After two years of teaching, she left her job in Maryland and moved back to Ohio to be

closer to family.

Shortly after returning to Ohio, she met her husband, David, and became married in late 1993. In 1994 Lauren and her husband had their first child, a son, and she became a stay-at-home mother. In 1998 she and her husband had a daughter. Lauren finally knew that being a mother was her career of choice.

As the children became older, and finances became strained, Lauren felt the need to contribute financially to her family while still being available to her children as a stay-at-home mother. Lauren did whatever she could to earn an income to help provide for her family and be home with her son. She wrote a newsletter for her dad's business and worked at a catering company in the evenings on and weekends.

As an educated woman, Lauren felt that she needed to make a significant financial contribution to the family. Knowing that her career choice as a teacher did not suit her, she endeavored into buying and selling real estate. This would enable her to work around her children's schedules and needs, and could still potentially provide a lucrative income to help with family expenses.

Lauren read "One Minute Millionaire" by Mark Victor Hansen and Robert Allen and was inspired to invest in real estate. The authors were trying to create one million millionaires who would give back to society. She decided to attend a seminar given by Robert G. Allen in Las Vegas that cost her roughly $4,000. She also participated in Hansen Home Deals where she made $50,000 on a preconstruction deal by selling the land. Armed with the information gathered at the seminars, and success that she tasted shortly after beginning this new career, Lauren was determined

to make money as a real estate investor. Lauren had already profited $50,000 on her first investment and on another, she profited $10,000. Having experienced success, she decided to continue with her plan.

While at a semi-pro basketball game with her son, she was given a game program that had an advertisement regarding Andrew Norman's real estate investment business. Andrew Norman's company sponsored the semi-pro basketball team. Lauren was familiar with Andrew Norman from when he was a basketball star at The University of Akron.

Though eager to continue to invest in real estate, Lauren was not confident in her real estate investing knowledge. While Lauren had success, she felt that she had a lot to learn. Lauren felt inept in most of her dealings. Lauren was looking for a mentor and when she saw that there was a local real estate investor to which she had a connection (her family watched Andrew Norman play basketball at the University of Akron), Lauren thought it was a great scenario, she could learn more about real estate investing through Andrew Norman.

Andrew Norman was upfront about his bankruptcy with Lauren. However, it was easy for Lauren to overlook because in all of the "inspirational" books that Lauren read, the author always indicated that one of the keys to success was to be willing to fail and then keep trying. The authors referenced people like Donald Trump and Robert Allen as people who have filed bankruptcy and come back even stronger. Lauren saw Andrew Norman's cars, house, property that he owned, the fact that he owned a semi-pro basketball team, and upcoming projects as evidence that he was on his comeback. Lauren also paid attention to the people he had investing in his projects,

doctors, a principal, and a former University of Akron basketball player whose mother Lauren knew because she worked at Lauren's insurance agent's office. In her effort to "not be afraid to fail" that was woven throughout the inspirational books that Lauren read, she paid attention to the pieces of the puzzle that added up to the deal being legitimate and ignored the pieces that were signs of a problem.

Andrew Norman discussed having Lauren invest in WatersEdge, in Florida. Andrew Norman's mortgage brokerage company, V.P. Equity, was to be used to assist Lauren obtain financing for the purchase. Since Lauren's husband was the only member of the family employed outside of the home, Andrew Norman and Lauren decided that they needed to use her husband's credit in order to obtain the financing.

On or about January 10, 2006, Lauren completed an initial application to secure a loan to purchase a condominium at the WatersEdge in Florida. On the January 10, 2006 application, with her husband's permission, Lauren signed her husband's name. On February 14, 2006, IndyMac denied the loan because there were "Insufficient Funds to Close" meaning that Lauren did not have enough cash on hand to make a down payment. Andrew Norman asked Lauren if there was anyone who could loan her money for a period of time so that the funds would be in her account when the bank made its verification. Lauren deposited a $15,000 check from her father into her account so that there would be additional funds in her account for closing. On February 22, 2006, Andrew Norman provided Lauren an official check in the amount of $30,000 that was allegedly "cash back at closing." The $30,000 was deposited into her joint bank account with her husband so as to give the appearance that she had sufficient funds to close. On February 27, 2006, a letter was added to her loan

application indicating that her husband, David May, had full access to a Chase bank account. Lauren was not aware of this letter until the USAO disclosed the evidence that it had against her. This February 27, 2006 letter was drafted by and executed by someone other than Lauren and is further discussed below. On February 28, 2006, David May signed a new loan application with information that Lauren provided. IndyMac accepted the resubmitted loan application as being "Clear to Close" and granted a loan for the property at WatersEdge, Lot #43, in Panama City, Florida. Lauren conducted the business of being a straw buyer through her husband, David, by directing her husband's actions, including the singing of documents used in securing financing for the WatersEdge property.

In exchange for Lauren having her husband act as a straw buyer to secure a mortgage loan in her husband's name, and causing her husband's credit to be used to purchase the WatersEdge property in Florida, Andrew Norman agreed to make all mortgage payments on the WatersEdge property for Lauren despite Lauren making representations to IndyMac bank that her husband would be responsible for the monthly mortgage payments. Andrew Norman also agreed to pay Lauren $20,000 in exchange for having her husband endorse a false loan application and other documents making her husband a straw buyer in the WatersEdge purchase. Finally, once the WatersEdge property was purchased, they planned to resell the property at a profit. The profit from the WatersEdge was going to be divided equally between Andrew Norman and Lauren.

Lauren expected that the WatersEdge property would sell so quickly that no, or very few, mortgage payments would have to be paid. To turn a quick, large profit,

Lauren provided false information on the loan application that she had her husband endorse. Instead of doing what was right, Lauren did what would turn a profit so that she could feel important. Lauren ignored her intuition. She knew that she should have ensured that all information on the loan documents was accurate, but her need to feel significant overrode her honesty at that time.

**LAUREN HAS ACCEPTED RESPONSIBILITY FOR HER ACTIONS**

Lauren is remorseful for what she has done and has accepted responsibility for her actions. Prior to any charges being filed against her, in 2008, Lauren began counseling for self-improvement. During this process, Lauren has worked on feeling empowered through seeing the good in her and the good that she does for others. She has learned that money should not be the nexus between feeling empowered and being successful. Through consistent counseling, not only has Lauren's self worth improved, Lauren has learned to listen to and follow her moral compass. She is grateful for the lessons in integrity that were learned in this process. She has come to realize that her earlier need to contribute monetarily to her family was more about filling a void of insignificance. With the help of her counselor, she has learned that her most significant contribution is giving of herself, whether to her family or by helping others; that money does not provide self-esteem.

Lauren has been successful under Pretrial Supervision since January 31, 2011. Despite requesting, and the Court granting Lauren the ability to travel outside of Ohio for a graduation and a family reunion in 2011, Lauren has stayed in the Northern District of Ohio. After witnessing the Court's hesitation to grant the requested leave, she re-examined the opportunities and chose not to go. Lauren decided to forego

attending these celebrations to acknowledge the seriousness of her offense and out of respect for the Court's authority. Lauren also chose not to request permission to travel this past summer to attend her niece's graduation and did not travel outside of the Northern District of Ohio, except for one day-trip with the permission of her Presentence Supervisor, while her son was visiting colleges. Lauren appreciates the seriousness of her offense.

Another way that Lauren has accepted responsibility is by being a productive member of society. Despite these criminal charges, and the challenges that one may encounter trying to find employment after being charged with conspiracy to commit bank fraud, Lauren has worked hard to obtain and maintain employment. Lauren is not afraid to work hard and no job is below her. Since being charged with this offense, Lauren has worked as an associate for Pier and Company, helping with estate sales, making eight dollars per hour. From November 2011, until February 2013, Lauren worked as an administrative assistant for HHL Accounting in Medina. She started at ten dollars per hour and after one year she received a raise to thirteen dollars per hour. When her brother required her assistance earlier this year at his printing business, Short Stack Printing, she went to work for him making fourteen dollars per hour. Lauren also has a small business, The Organized Path, where she utilizes her psychology degree to help others as a mentor and life coach. Lauren understands that what she did as a straw buyer took from society, so she is doing all that she can to give back to society through her time and talent.

**LAUREN WAS A MINOR PARTICIPANT IN THE OVERALL SCHEME**

Lauren was one of over thirty straw buyers recruited by Jack Coppenger and

Andrew Norman. She did not know or had ever met any of the other straw buyers. She did not recruit any of the other straw buyers. She was not involved in any way in orchestrating the magnitude of the overall plan that involved several properties. Lauren had no ownership interest in HH&N, LLC, V.P. Equity, LLC, Ocean Sands Investment Group, LLC, or East Bay Land Holdings, LLC. Lauren's involvement was limited to her straw purchase of one condominium in the WatersEdge development.

**LAUREN PROVIDED SUBSTANTIAL ASSISTANCE TO THE UNITED STATES ATTORNEYS OFFICE**

Lauren met with the USAO on two separate occasions to provide them with all of the information she had regarding the transaction involving Andrew Norman, Jack Coppenger, HH&N, LLC, V.P. Equity, LLC, Ocean Sands Investment Group, LLC, and East Bay Land Holdings, LLC. Lauren also brought in documents for the USAO to use in their investigation that they did not already have in their possession.

In reviewing the evidence that the USAO had against her, Lauren discovered, and pointed out to the USAO that the February 27, 2006, "Full Access" letter that was part of her loan application, was a forgery. Lauren did not draft the letter, was not aware of the letter before reviewing the USAO's evidence against her, nor did she sign the letter. The letter, attached hereto, stated that Lauren was giving, "…[her] husband, David May, 100% access to [their] checking account [ending in …430] through JP Morgan Chase Bank." This letter makes no sense. Lauren and her husband were joint holders on the Chase bank account referred to in the letter; he had full access to the account. Lauren is not sure who generated this letter or for what purpose this letter was generated, but she in no way involved in creating it or endorsing it.

An examination of Lauren's signature on all of the documents provided to the Court in this matter (Waiver Of An Indictment attached) and the forgery reveal, among other things, that the "L" in Lauren's real signature has a gap between the top and bottom loops of the cursive "L." The forgery has no gap between the two loops of the "L," and in fact, the loops intersect each other. Lauren's "L" is linear where the "L" in the forgery is curvaceous. Additionally, the "y" in Lauren's last name, "May" in Lauren's real signature contains a gap between the top portion of the "y" and the loop at the bottom of the "y." The bottom loop of the "y" in the forgery almost touches the top curve of the "y." Just as in the "L," in Lauren's real signature, Lauren's "y" is linear where the "y" on the forgery curvaceous and without a gap between the top loop and the bottom loop. It is believed that this document may have been created by, or was caused to be created by, one of the mater-minds of this mortgage fraud scheme to cause the loan application to be accepted by IndyMac. We will never know whether Lauren's loan would have been rejected had this letter not been part of the loan application. This does not minimize Lauren's responsibility for completing the loan application with false information but revealed to the USAO that Andrew Norman, Jack Coppenger, HH&N, LLC, V.P. Equity, LLC, Ocean Sands Investment Group, LLC, East Bay Land Holdings, LLC, and the other master-minds of this scheme did whatever it took to get the straw buyers approved, even if that meant fabricating documents of which the straw buyers were unaware.

**RELATED CASES**

18 U.S.C. Section 3553(a) (6) requires that the court consider and avoid unwarranted sentence disparities among defendants found guilty of similar conduct.

While there are several cases regarding the violation of 18 U.S.C. Section 371 as it relates to the sentencing of those who orchestrated the mortgage fraud scheme and recruit straw buyers, there is very little case law regarding the sentencing of the straw buyer.

One case on point, *United States v. Robers*, 698 F.3d 937 (7th Cir. 2012), provides insight where the defendant, a straw buyer who plead to the Information, was sentenced to three years' probation and was ordered, based on the recommendations contained in his Presentence Investigation Report, to pay $ 218,952 in restitution. In the *Robers* case, the defendant was involved in the purchase of two of the fifteen homes involved in the overall mortgage fraud scheme. Distinguished from *Robers*, Lauren was involved in the purchase of one out of an estimated thirty condominiums in the overall scheme. Additionally, unlike the *Robers* case, the Presentence Investigation Report submitted to this Court on March 1, 2011 regarding Lauren May states, "…it does not appear Mrs. May is capable of paying a fine at this time." Lauren May respectfully requests that this honorable Court take her limited resources into consideration when it hands down its sentence.

## CONCLUSION

Lauren's character should not be measured by this isolated occurrence. Prior to this infraction, Lauren had no criminal history. Lauren knows right from wrong and is a good, generous person as the Court can see by the attached letters from family, friends and associates. Lauren entered into this purchase during a period of weakness in her life. This real estate transaction was more about Lauren trying to fill a void in her life than it was about filling her pockets. It is unlikely that Lauren would be involved in this type of activity in the future. Lauren May's conduct falls well below the

conduct typical of the offense and a sentence greater than the sentence recommended and agreed upon the parties is not warranted. Lauren May respectfully request that this Court impose a sentence as agreed upon by the parties.

Respectfully submitted,

s/*Elisa A. Staats*
Elisa Staats (0062682)
679 West Market Street
Akron, Ohio 44303
330.701.8865
330.258.1171 Facsimile
attyelisa@mac.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 22, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the court's system.

s/*Elisa A. Staats*
Elisa A. Staats (0062682)
Attorney for Defendant Lauren May

**INDEX OF ATTACHMENTS**

A. FORGED LETTER PLACED IN LAUREN'S LOAN APPLICATION

B. WAIVER OF AN INDICTMENT SHOWING LAUREN'S SIGNATURE

C. LETTER OF CHRISTINE MCCORKLE, LISW

D. LETTER OF LAURIE B. PRICE, CPA, HHL GROUP, INC.

E. LETTER OF JANA TUCKER

F. LETTER OF KASEY CLAYTOR

G. LETTER OF NANCY NICHOLAS

H. LETTER OF LISA WILLIAMS

I. LETTER OF MICHELLE HAZLEWOOD

J. LETTER OF ELYSE HOPE KILLORAN

K. LETTER OF PENNY HAZEN, MA ED., BCC

L. LETTER OF CAL HUNTER, JR.

M. LETTER OF DAVID E. MAY

N. LETTER OF KAREN STROMQUIST, LAUREN'S SISTER